78 N.J. Super. 294 (1963)
188 A.2d 427
KATHERINE H. FAGAN, PETITIONER-APPELLANT,
v.
CITY OF NEWARK, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 1962.
Decided February 14, 1963.
*297 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Bernard T. Hein argued the cause for petitioner-appellant (Messrs. Hein, Smith & Mooney, attorneys).
Mr. William H. Walls argued the cause for respondent-respondent (Mr. Norman N. Schiff, attorney).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This case presents the question whether the death from heart attack of a Newark fireman is *298 proven to have been causally related to his employment so as to justify an award of workmen's compensation. Recovery was allowed in the Division of Workmen's Compensation, but reversed on appeal by the Essex County Court. Important questions of evidence law are presented for consideration.
Decedent Thomas A. Fagan, aged 62 at the time of his death on July 1, 1959, had been a fireman with the City of Newark for many years. For the last six years he had been assigned to a "special services supply company" having the function of delivery of supplies and apparatus to other companies. Older men were generally assigned to this company as it was not ordinarily involved directly in fire-fighting.
On June 29, 1959 Fagan and a co-worker, Bishof, were serving together and alone on the night shift for the stint from 6 P.M. to 8 A.M. About the time the men came to work there was a phone call requesting delivery of a fire extinguisher to Company No. 8. Bishof loaded the fully charged CO[2] extinguisher, weighing about 48 or 49 pounds, on a light delivery truck, along with an eight-pound tarpaulin destined for another company. Fagan drove off to make the deliveries at about 6:05 or 6:10 P.M. and returned about 6:30 or 6:35 P.M. Bishof testified that on return Fagan "was very flushed in the face, and he told me he felt dizzy, and ill, and had hurt himself lifting the CO[2] out of the truck, he told me." Respondent objected after the statement, the latter part of which was not responsive to the question, was completed, but the judge of compensation ruled: "I will allow it." This answer was amplified on cross-examination to indicate Fagan said "he hurt his arm and shoulder and felt dizzy * * * and he was going to lie down." Fagan went up to lie down on a firehouse bed, and when Bishof next saw him, about 10 P.M., he was "resting, asleep, and he was breathing very heavily." During the night he heard Fagan moaning from time to time. When Bishof looked at him in the morning he appeared to be "flushed"; he "didn't look like he usually looked."
When the men reported for work on June 29 Fagan looked "very good" to Bishof. "He was his own jovial self."
*299 Bishof testified that, being the younger man, he usually did the heavier work when he teamed with Fagan on night duty. However, Fagan had on occasion delivered fire extinguishers previously.
Bishof testified it was his duty to record what Fagan had told him when he returned from the delivery in question in a company ledger or "log," and that he did so on this occasion. Chief Kelly of the special services supply company produced the log and read an entry therefrom recorded as made Monday, June 29, 1959, reading: "Fireman Fagan reported that he injured his left shoulder and arm lifting a CO[2] from body of truck. Also that he felt dizzy and was going to lay down for a while." Kelly identified the writing as made by Bishof. He explained: "This is an entry made in the journal, anything happens, and deliveries made, anything unusual that happens." Anyone on duty at the time is required to make such entries. There was no objection to this proof when adduced.
Fireman Leblein, acting captain of Company No. 8 when Fagan delivered the extinguisher, testified that when he noticed Fagan, the extinguisher had already been left on the company floor, at a point about 25 feet from the parked truck. No one had assisted Fagan, none of the other firemen being on the floor at the time. The tailgate of the truck was up, its floor about five feet from the ground. As Fagan left, Leblein asked him, "How do you feel, Harp?" and the response was, "Not so hot." Leblein testified that when Fagan made deliveries to his company the men "always helped him." The explanation, "because we knew he was sick," was stricken by the judge of compensation. There was some other testimony tending to indicate that firemen at companies to which Fagan delivered equipment generally assisted him to unload, inferably because of his age or infirmity.
Fagan's wife, petitioner below, testified that when he returned home at 10 A.M. on June 30 he was nauseous, his face was flushed, and he was having trouble breathing. He ate *300 no lunch, and complained all day of chest pains and difficulty in breathing. When the symptoms continued, his son took him to the doctor in the evening. He was brought home, the pain increasing and extending into his arm. At 6 A.M. the next morning he fell out of bed. An ambulance physician pronounced him dead shortly thereafter.
Mrs. Fagan testified that Fagan had suffered a heart attack in August 1958. A hospital record of the 1958 episode noted a history of "`clutching' pain in chest on exertion recently," and "severe pain in chest" the evening of admission to the hospital while watching "T.V. fights." The final diagnosis in the hospital record under signature of Dr. Barnert was "myocardial infarction due to arteriosclerotic coronary thrombosis."
Dr. Barnert testified he treated Fagan for a coronary thrombosis sustained in August 1958, and saw him at intervals thereafter. He examined Fagan on the evening of June 30, 1959. There were complaints of chest pain, vomiting and sweating during the day. An electrocardiograph was taken, indicating "a very slightly impaired blood flow to the heart." This showed little change from previous electrocardiographs taken in October 1958 and January 1959 indicating some heart damage, but "nothing active." The doctor advised Fagan to go to the hospital, but he refused. Dr. Barnert's diagnosis on the evening of June 30, 1959 was "myocardial ischemia." The doctor certified the cause of death on the official death certificate as: "Myocardial infarction; arteriosclerotic heart disease." On cross-examination, Dr. Barnert said Fagan gave him no "history of any accident." Mrs. Fagan and her son also testified Fagan had said nothing to them about an accident at work.
Dr. Saul Lieb, a specialist in internal medicine, gave an opinion, based upon a hypothetical question incorporating the substance of the foregoing testimony, including Fagan's statement to Bishof as to hurting his arm and shoulder, that Fagan's death was "related to his work as a fireman." That the witness meant causal relation is clearly indicated by the *301 explanation he gave for his answer. He said that the effort expended in lifting a 48-49 pound extinguisher from a 5-foot high panel truck and carrying it a distance of 25 feet
"was a competent producing cause initiating the onset of the attack of acute coronary insufficiency when it was superimposed on a pre-existing condition of arteriosclerotic heart disease * * *. Considering the subsequent events, it would be my opinion what he considered an injury to the left arm and shoulder and dizziness was actually an indication to him of the onset of the attack of an acute coronary insufficiency. Thereafter the facts in the hypothetical question are those that would indicate there was progression of this attack of acute coronary insufficiency as indicated by the fact that he was found to be breathing hard, looked flushed and thereafter his condition deteriorated the following day as he had to rub his chest and had trouble breathing. He felt nauseous and had to sit by the window until he finally went to Dr. Barnett [sic] who found evidence of myocardial ischemia such as found in coronary insufficiency and that his condition progressed until he died the following morning from a myocardial infarction. It is my opinion this attack of acute coronary insufficiency progressed so that it culminated in acute myocardial infarction that caused his death."
Dr. Jack S. York, an internist, also testifying on the basis of a hypothetical question, was called by respondent, and gave an opinion that there was no "causal relationship" between Fagan's occupation and his death. However, the question excluded any mention of the incident concerning the delivery of the fire extinguisher, specifically the statement alleged to have been made by Fagan to Bishof when returning from the delivery mission, or of the sharp difference in Fagan's appearance and condition immediately before and after that mission. But when the facts as to the extinguisher episode and the statement to Bishof were added to the hypothesis on cross-examination and an opinion as to causal relationship requested, Dr. York said:
"I think it is very difficult to say. I think an individual who has mentioned angina as this man, according to the hypothetical question, would not describe an anginal syndrome which might cause pain in the left arm and shoulder as an injury because the characteristic thing about angina is, once the pattern is established of the individual's characterization of pain and the localization of pain so that, *302 with the history, he had suffered angina before [sic]. The only thing I can assume from that is that it was a different type of pain than one would expect from coronary artery involvement or angina."
Upon the hypothesis being further expanded to include the continuity of the symptoms of distress during the night of June 29 and the next day, the doctor said: "Well, the only thing I could state from those additional facts is that the symptoms he presented at 10:00 o'clock the next morning when he came home of nausea and shortness of breath could be associated to his cardiac condition but in essence it does not change my opinion." The doctor ventured the opinion that Fagan "may have pulled a little ligament in his left shoulder and an individual can get flushed from that."
The judge of compensation found, essentially, that the statement said to have been made by Fagan to Bishof was in fact made and was true; that the symptoms described were probably thought by Fagan to have been accidental but were actually anginal and a precursor of the attack the decedent experienced soon thereafter; that it was not customary for Fagan to lift or carry fire extinguishers, but for others to do this for him. He found the hypothesis of probability of causal connection between the decedent's work and the heart accident to have been satisfactorily established.
The Essex County Court on appeal denied credence to Bishof's testimony. While conceding admissibility of the testimony as to Fagan's report to Bishof on the theory of res gestae, the court was "not satisfied that the report was actually made." Particular significance was found in the facts that Fagan told no one else of the "accident" and that Bishof sought no medical aid for Fagan. The testimony as to the past practice of helping Fagan unload was deemed largely "tailored" to a desired result. The court did not refer to the entry in the company log.
From the briefs and argument before us the following issues emerge: (1) was the testimony as to Fagan's statement to Bishof admissible under the res gestae doctrine; (2) was the entry in the company log competent proof of the truth of *303 the facts recited therein under the Uniform Business Records as Evidence Act, N.J.S. 2A:82-34 to 37; (3) if issues (1) and (2), or either, are answered in the affirmative, is it probable on the whole case (a) that Fagan actually made the indicated complaints to Bishof, and (b) that the work episode was a material factor in causing, contributing to, or accelerating the heart episode and Fagan's consequent death?
Preliminarily, we voice our concurrence with the County Court in its view that the proof of a complaint by Fagan to Bishof of having hurt his arm and shoulder and being ill is basic to petitioner's claim. Without this evidence, the mere fact of delivery by Fagan of a fire extinguisher between the time he left the supply company and returned a half-hour later would not, although considered with the other proofs, in our judgment generate sufficient probative force to justify a conclusion of probable causal relationship between employment and death. Thus, establishment of the competency of either the testimony of Bishof or the log entry is a sine qua non of the claim here contested, both factually and legally. Andricsak v. National Fireproofing Corp., 3 N.J. 466, 471 (1950); Gilligan v. International Paper Co., 24 N.J. 230, 236 (1957).

I.
The only facet of the lump-concept "res gestae" pertinent here is that denominated "spontaneous exclamations," 6 Wigmore on Evidence (3d ed. 1940), § 1745, p. 131 et seq., sometimes classified as "excited utterances," McCormick, Evidence (1954), § 272, p. 578, et seq.; Andricsak v. National Fireproofing Corp., supra; Atamanik v. Real Estate Management, Inc., 21 N.J. Super. 357 (App. Div. 1952), and cases cited; Carter v. Public Service Coord. Transport, 47 N.J. Super. 379 (App. Div. 1957). There have been many efforts to state the rationale of the rule. Essentially it is that a startling or shocking event may generate excitement *304 psychologically tending to guarantee the trustworthiness of a declaration or statement by the subject made not too long thereafter when the person is still under the sway of such excitement and free from any influence tending to make the statement a mere narrative of a past event and therefore potentially a contrivance within the exclusionary policy of the hearsay rule. The length of the elapsed period is of weight but not controlling. Large discretion as to admissibility is necessarily reposed in the trial judge. McCormick, op. cit., at p. 579.
The case for admissibility here is aided by the consideration that so much of Fagan's statement as reflects illness, dizziness, etc., is admissible under the rule that a declaration as to the declarant's present bodily condition and symptoms, made naturally and without apparent premeditation, is an exception to the hearsay rule. McCormick, op. cit., at p. 561. The declaration need not be made to a physician in order to qualify. Id., at p. 562; De Palma v. Economy Auto Supply Co., 3 N.J. Misc. 827, 130 A. 206 (Sup. Ct. 1925), affirmed 102 N.J.L. 714 (E. & A. 1926). The crucial factual inquiry in the present case, however, is whether the decedent's distress began contemporaneously with the alleged lifting or carrying of the fire extinguisher, and therefor the critical legal issue is the admissibility of Bishof's testimony insofar as it refers to Fagan's statement that he hurt his arm and shoulder when doing the lifting. But a bridging symptom of pain or distress extending continuously from the exciting event to the time of the declaration is often a material factor in influencing a ruling of admissibility on the theory of an excited utterance. McCormick, op. cit., at p. 581, n. 19; and see Atamanik v. Real Estate Management, Inc., supra, 21 N.J. Super., at p. 364. On this basis, accordingly, we would ordinarily be inclined to hold that the admissible declaration of illness and dizziness, clearly an inferable continuous consequence of the alleged "hurt," the latter apparently transpiring about 15 minutes prior to the declaration to Bishof, would justify admission of the whole declaration *305 as an excited utterance. Fagan's interim remark in answer to an inquiry from the captain at Company No. 8 that he did not feel "so hot" does not necessarily detract from the spontaneity of the complaint of injury and illness to Bishof. This could well have been a colloquialism understating the distress he actually felt at the moment and not necessarily impairing the continuity of the exciting effect of the occurrence. But we do entertain concern over compliance with one other recognized requisite of the hearsay exception under consideration.
The problem here is that the "exciting" event is itself the litigated fact to be proved  i.e., the hurt to the arm and shoulder when lifting the extinguisher. Factum probans is factum probandum. Is the proponent to be allowed to lift himself by his own bootstraps and gain admission of the statement by an assumption of the fact the statement is intended to prove? Most frequently there is some other evidence of the exciting occurrence in the case aside from the disputed declaration. See, e.g., Slayback Van Order Co. v. Eiben, 115 N.J.L. 17 (Sup. Ct. 1935); Atamanik v. Real Estate Management, Inc., supra. An unusually well-reasoned discussion of the point is to be found in Annotation, 163 A.L.R. 15, 219 et seq. (1946), where it is said that (p. 219) "a declaration cannot possibly be admitted `as part of the res gestae' of an event of which it is itself the only evidence * * *. Decisions appearing to contradict this proposition on their facts, if sound at all, should be placed on some other ground." The "other ground" to be distilled from a number of cases analyzed in the annotation in application to the workmen's compensation field is that unwitnessed accidents in employment eventuating ultimately in death of the employee are so frequent that unless a statement by the decedent to fellow employees or family otherwise meeting the requirements of the excited utterance rule is admitted without independent proof of the event, recovery will be denied so frequently as to impair the basic objective of the workmen's compensation law. This philosophy was forcefully expressed in Jacobs v. *306 Village of Buhl, 199 Minn. 572, 273 N.W. 245 (Sup. Ct. 1937). Comparably liberal approach is manifested in such compensation decisions as Johnston v. Payne-Yost Constr. Co., 292 Pa. 509, 141 A. 481 (Sup. Ct. 1928); Hartford Acc. & Indem. Co. v. Olivier, 123 F.2d 709 (5 Cir. 1941); Page v. City of Osceola, 232 Iowa 1126, 5 N.W.2d 593 (Sup. Ct. 1942); Temple v. Martin Veneer Co., 200 So. 676 (La. App. 1941); Devlin v. Department of Labor and Industries, 194 Wash. 549, 78 P.2d 952 (Sup. Ct. 1938). Without further encumbering this discussion by citations, it may be stated that most courts, however, deny admissibility in compensation cases where the facts indicate there is no other proof of the exciting accidental occurrence than the declaration itself, although the reason for decision is frequently formulated on other kinds of default in application of the rule, such as absence of spontaneity, etc. Annotation, supra, 163 A.L.R., at pp. 219-232, passim.
McCormick justifies the liberal approach on this point on the theory that "the trial judge in passing upon issues of fact preliminary to the admission of evidence is not bound by the jury trial rules of exclusion." Op. cit., at p. 579, n. 8. He admits, however, that what he describes as "this sensible view" is "hardly borne out by the practice of American courts generally on such issues." Ibid. Obviously no such preliminary trial finding is ever made in compensation cases. Moreover, to do so would present the anomaly that the fact-finder in compensation would in effect conclude the meritorious fact issue by his preliminary finding of fact on admissibility. It appears to us that the most candid approach to this problem would be for the appropriate tribunal to make a value judgment as to whether the social policy subserved by the compensation law warrants frank formulation of a special rule for compensation cases, admitting declarations of deceased workmen made reasonably close to the time of the accident, without regard to independent proof of the exciting occurrence, the probative weight of the statement itself being *307 left to the fact-finder, rather than to persist in these cases with illogical application of the excited utterance rule.[1]
The matter of adoption of such an approach, however, is not for this intermediate appellate court.
In the light of the discussion above, we forego a determination as to whether the declaration is admissible as res gestae, as we have concluded that the crucial proof is competently supplied by the entry in the company log or journal. We proceed to discuss that issue.

II.
It will be noted, at the outset, that the County Court made no reference to the entry in the company journal, perhaps because it was assuming admissibility of Fagan's statement as res gestae. However, it is obvious that if Bishof contemporaneously wrote the entry in the journal, there is added justification for a factual conclusion that Fagan did make such a declaration to Bishof, contrary to the County Court's finding that the statement was in fact not made. We reserve further consideration of that factual issue for III. hereinafter.
We pass the question whether respondent's failure to object to the journal entry when it was offered in evidence in the Division precludes its raising the issue of competency now on the basis of the settled principle noted above that a legal award of compensation must be undergirded by some competent *308 proof of the matters essential for recovery in the particular case. The evidence question involved is important and without explication in our reported decisions in the present context. We therefore undertake its resolution.
Petitioner urges that the journal entry is competent under the Uniform Business Records As Evidence Act, L. 1949, c. 124, N.J.S. 2A:82-34 et seq. N.J.S. 2A:82-35 reads as follows:
"A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."
N.J.S. 2A:82-34 defines the term "business," as used in the act, as including "every kind of business, profession, occupation, calling or operation of an institution, whether carried on for profit or not." Respondent does not assert that the operation of its fire department is not "business" within that broad definition. It does, however, argue (1) that the recording of reports of accidents in a fire company's journal is not the "business" of the fire department within the intent of the act, citing Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1942); and that even if it were conceded that the entry was made in the course of the department's business it would still not be admissible for the truth of the "included hearsay" constituted by the information contained therein provided by Fagan. The position urged is that the testimonial competency of the latter depends upon its independent compliance with some other recognized exception to the hearsay rule, such as admissions, statements to physicians germane to treatment, or the like, and that Fagan's statement as respects the manner in which he "hurt" himself meets no such requisite, but is, to the contrary, purely self-serving, and is as incompetent as if related by Bishof on the stand without benefit of entry in the journal.
*309 Study of these arguments in depth reveals a long-standing and earnestly debated controversy over the legitimate scope of modern statutes on admission and evidential force of business records. See Note: "Revised Business Entry Statutes: Theory and Practice," 48 Colum. L. Rev. 920 (1948); Polasky and Paulson, "Business Entries," 4 Utah L. Rev. 327 (1954); Laughlin, "Business Entries And The Like," 46 Iowa L. Rev. 276 (1961); and the discussion infra. In addition to the specific contentions of respondent, there is necessarily implicated also the question as to whether and to what extent the potential motive to falsify or misrepresent on the part of those making or providing information incorporated in business entries affects admissibility thereof as proof of the truth of the contents of such entries.
The modern "business records," McCormick, op. cit., § 281, p. 596, or "regular entries," 5 Wigmore, op. cit., § 1517, pp. 346 et seq., exception to the hearsay rule is founded upon the twin principles of reliability and necessity. Thus, at common law, where the entrant (and informant, if knowledge of the information was in one other than the entrant), was unavailable, the records themselves were admissible even in litigation between third persons on the theory of unusual reliability of original records maintained in the regular course of business and the fact of customary reliance upon them by businessmen.[2] Under the American view it makes no difference that the entry or report upon which it is based is made in the course of the actor's own business rather than in the course of duty to another. McCormick, op. cit., at p. 599.[3]
*310 In the course of time, either by statute or modification of the common-law rule, as business records and modern methods of making and preserving them became increasingly complex and mechanized, the absolute necessity of establishing the unavailability of entrants and informants was abrogated on grounds of convenience, and establishment of the regularity of the record was substituted, either absolutely or in the discretion of the trial court. McCormick, op. cit., at pp. 605, 606; 5 Wigmore, op. cit., § 1530, p. 379. In application of the statutory policy, see Mahoney v. Minsky, 39 N.J. 208 (1963); Webber v. McCormick, 63 N.J. Super. 409, 416 (App. Div. 1960). Compare Grobart v. Passaic Valley Water Commission, 134 N.J. Eq. 413, 414 (Ch. 1943), with Cohen v. Borough of Bradley Beach, 135 N.J.L. 276 (E. & A. 1947), and New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co., 59 N.J.L. 189 (E. & A. 1896), all antedating the statute. The modification of the common-law rule in the respects just mentioned was the ostensible justification for the formulation of both the Uniform Business Records as Evidence Act and what is often referred to as the Model Act, adopted substantially verbatim in the federal[4] and New York jurisdictions and in a few other states, although more fundamental objectives were undoubtedly also intended. See Mahoney v. Minsky, supra.
*311 The Model Act is sometimes referred to as the Commonwealth Fund Act, since it was the product of a distinguished committee created by the Commonwealth Fund which included Professors Morgan and Wigmore. The proposed act and commentary thereon are set forth in a 1927 report entitled, "Proof of Business Transactions to Harmonize With Current Business Practice," generally attributed to Morgan, but incorporated in The Law of Evidence  Some Proposals for its Reform (1927) (at pp. 51 et seq.), under the imprimatur of all members of the committee. The commentary stresses the objective of simplifying proof of commercial transactions on a basis consistent with the common acceptance of and reliance upon business records by the community at large.
The Uniform Act, adopted in New Jersey (citation supra) and some 16 other states, evolved from a recommendation of a proposed act in 1933 by the Committee on Evidence Acts (including Professor Wigmore) of the National Conference of Commissioners on Uniform State Laws. After intervening debate and revision the act was approved by the Conference in 1936. The "explanatory note" of the approved text (Proceedings, 1936, p. 350) states that the common-law rules were "full of technicalities," notes the activity of the Commonwealth Fund Committee and its proposed act, which it describes as a "simple and lucid statute on this subject," and describes the current work of the Conference as devising "a standard wording" intended to achieve uniformity in the *312 law among the states. There is no explanation in the proceedings of the specific differences in language between the Commonwealth (Model) Act and the proposed Uniform Act. There is only a statement by Professor Wigmore (Proceedings, 1936, p. 177) that the committee gave consideration to the Commonwealth Fund Act and founded its proposal on that act "but with some improvement." The significance of the specific changes as "improvements" is unfortunately not elucidated anywhere in the proceedings of the Conference. It is apparent that the principal differences, in relation to the issues in the present case, are these: (1) the Model Act expressly negates inadmissibility because of lack of personal knowledge by the entrant (nothing is said as to the informant), that factor and "other circumstances of the making" of the writing or record going only to weight; (2) the Model Act expressly includes a "writing" as well as a record, "whether in the form of an entry in a book or otherwise" (emphasis supplied); and (3) the Uniform Act vests discretion in the trial judge to determine whether the sources of information, method and time of preparation of the record are such as to "justify its admission."
It is at once apparent that reports of or concerning accidents, although entered in or kept with the records of a business or other qualified institution, present fertile material for controversy. The subject matter does not involve regular entries of commercial accounts of the type historically thought to import truthworthiness. The underlying information often comes from volunteers or others having no duty to anyone to report truthfully. And frequently the entrant or informant has a motive to misrepresent in order to exculpate himself or his employer from fault, or, contrariwise, in order to support a prospective claim. These considerations have inspired narrowness of approach by some courts in application of the business entry rule or statutes to accident reports or kindred nonrecurrent, casual or occasional-type reports or statements. See 43 Colum. L. Rev. 393 (1943); Polasky and Paulson, op. cit. (4 Utah L. Rev., at pp. 343-346); 4 Stan. L. Rev. *313 288, 291 (1952); McCormick, op. cit., § 287, p. 603. On the other hand, the tendency toward critical re-evaluation of the hearsay rule itself, e.g., Morgan, "Hearsay Dangers and the Application of the Hearsay Concept," 62 Harv. L. Rev. 177, 218, 219 (1948); American Law Institute, Model Code of Evidence (1942), Rule 503; and see dissenting opinion of Chief Justice Vanderbilt in Robertson v. Hackensack Trust Co., 1 N.J. 304, 315, 317 (1949); has stimulated championship of a broad construction of the modern statutes by respected evidence scholars in relation to admissibility of entries not of a bookkeeping or commercial character by stressing the flexible language of the legislation as actually drawn rather than conventionally cited criteria of truthworthiness of records entered in the regular course of business. See 5 Wigmore, op. cit. § 1520, p. 362 ("The liberal interpretation of [the Model Act] by courts should serve to give the [business entry] Exception a rational relation to the search for truth. But much depends upon whether the perverse stolidity of the juristic mind can be compelled by a few statutory words to leave its accustomed ruts."); Morgan, "Evidence 1941-1945," 59 Harv. L. Rev. 481, at p. 566 (1946); Maguire, Evidence: Common Sense and Common Law, p. 156 et seq. (1947).
As indicated, respondent's principal reliance for the contention that records of its fire department pertaining to accidents are not records made in the course of its business is upon the decision of the United States Supreme Court in Palmer v. Hoffman, supra, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645. The case involved the admissibility under the Federal Business Records Act (Model Act) of a statement by the engineer of defendant's train taken in the course of an interview by a railroad superintendent two days after the occurrence of the accident giving rise to the action. The engineer had died before trial. The trial court's exclusion of the statement, on offer by defendant, was sustained by a majority decision of the Second Circuit Court of Appeals, mainly on the ground of the strong motive to misrepresent on the part *314 of the informant. Hoffman v. Palmer, 2 Cir. 129 F.2d 976 (1942). Mr. Justice Douglas, writing for the Supreme Court, affirmed, but on the different ground that the statement was not made "in the regular course of business." It was said that the engineer's report was "not a record made for the systematic conduct of the business as a business"; that although an accident report "may affect that business in the sense that it affords information on which the management may act," it was nevertheless not "typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls." (318 U.S., at p. 113, 63 S.Ct., at p. 480). The report was dismissed as of "primary utility * * * in litigating, not in railroading" (at p. 114, 63 S.Ct., at page 481). This decision has been the subject of severe criticism as an unwarranted abridgement of the scope of the Model Act. See the writings of Professors Morgan and Maguire, last cited in the preceding paragraph hereof. Morgan's views merit particular weight, as he was the leading member of the Commonwealth Fund Committee which drafted the Model Act upon the basis of which Congress legislated the federal statute in 1936. See also adverse comment in Note: 56 Harv. L. Rev. 458 (1942); "Revised Business Entry Statutes: Theory and Practice," op. cit. (48 Colum. L. Rev., at p. 925). But compare 43 Colum. L. Rev. 392 (1943).
The effect of some subsequent decisions, particularly in the federal courts, and notably in the Second Circuit, has been to whittle down the authority of the Douglas opinion in Palmer to strongly self-exculpatory accident records offered by defendants to rebut negligence or fault. McCormick, op. cit., pp. 604, 605; Pekelis v. Transcontinental & Western Air, Inc., 187 F.2d 122, 23 A.L.R.2d 1349 (2 Cir. 1951) (report permitted to be used by plaintiff); Puggioni v. Luckenbach Steamship Company, 286 F.2d 340 (2 Cir. 1961) (defendant allowed to offer report made by employee of third-party defendant); Terrasi v. South Atlantic *315 Lines, Inc., 226 F.2d 823 (2 Cir. 1955) (log maintained by defendant shipowner's doctor admitted; Palmer distinguished on ground entrant was also defendant); U.S. v. New York Foreign Trade Zone Operators, 304 F.2d 792 (2 Cir. 1962) (plaintiff entitled to admit accident report of superior in same employment, defendant being third person; "We do not understand Palmer v. Hoffman to require the exclusion from evidence of all records which were made with some contemplation that they might be valuable in the event of litigation," at p. 797); Gallup v. Sparks-Mundo Engineering Co., 43 Cal.2d 1, 271 P.2d 34 (Sup. Ct. 1954) (under Uniform Act; log entry by decedent admissible though "self-serving"; facts showed no motive to misrepresent); accord: Chillstrom v. Trojan Seed Co., 242 Minn. 471, 65 N.W.2d 888 (Sup. Ct. 1954) (compensation case).
See common-law rulings for admissibility in Sullivan v. Minneapolis St. Ry. Co., 161 Minn. 45, 200 N.W. 922 (Sup. Ct. 1924) (report of conductor admissible for defendant, plaintiff's claim being unknown at time of report), and Geralds v. Champlin, 93 N.H. 157, 37 A.2d 155 (Sup. Ct. 1944).
Insofar as the stress in Palmer is upon accident reporting or litigating not being the business of the entity with or by which the report is filed or entered, the case does not preclude admission of reports to others concerning the effects of accidents by doctors made in the course of their business.[5]Korte v. New York, N.H. & H.R. Co., 191 F.2d 86 (2 Cir. 1951), cert. denied 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652 (1951); Landon v. United States, 197 F.2d 128 (2 Cir. 1952); White v. Zutell, 263 F.2d 613 (2 Cir. 1959); Lebrun v. Boston & M.R. Co., 83 N.H. 293, 142 A. 128 (Sup. Ct. 1928). Contra: Masterson v. Pennsylvania R. Co., 182 F.2d 793 (3 Cir. 1950).
*316 However, the basic approach of Mr. Justice Douglas in Palmer v. Hoffman has been followed in such cases as Nuttall v. Reading Company, 235 F.2d 546 (3 Cir. 1956) (plaintiff not permitted to use statement made to defendant's investigator by fellow-employee after action begun); Chapman v. U.S., 194 F.2d 974 (5 Cir. 1952); and Neuman v. Pittsburgh Railways Company, 392 Pa. 640, 141 A.2d 581 (Sup. Ct. 1958) (under Uniform Act).
Our survey of the authorities satisfies us that Bishof's entry of Fagan's statement to him in the special services supply company log "was made in the regular course of business" of the Newark Fire Department. We need not say whether we would follow the Supreme Court opinion in Palmer v. Hoffman on its precise facts in a case arising under our (uniform) act. A debatable issue is possible on the question whether an intracompany administrative investigation of an accident which with clear foreseeability promises to ripen into a negligence action against the company, may constitute the basis of a record in the regular course of business, within the meaning of the Uniform Act. Moreover, as discussed hereinafter, exclusion by a trial court could possibly be justified on the basis of the statutory authorization of the judge to determine whether "the sources of information, method and time of preparation were such as to justify * * * admission." (Emphasis ours.) But we are clear that the method adopted by the fire department here for the receipt and recordation of this and similar type information meets the requirements of the statute. We examined the original company journal (log) at the argument. This contained a number of comparable entries of accidents or injuries to firemen in the course of duty prior and subsequent to the Fagan incident. It is obviously in the interest of prudent conduct of the department that contemporaneous reports of such occurrences should be recorded, not only for verification of claims but to promote more efficient operation. The testimony briefly but sufficiently satisfied the requisites of identification of the journal and the mode of its maintenance, as well as of *317 proximity in time between event and recordation. We hold that the entry was in the regular course of business.
We pass to a consideration of the respondent's attack upon the alleged "included" or "double" hearsay involved in petitioner's use of Fagan's declaration as set forth in the entry to establish the truth of the content thereof  specifically his having hurt his left arm and shoulder when lifting the extinguisher. The problem is allied to that of the effect of the possible motivation to misrepresent on the part of the informant.
Reflection upon the nature of the conventional business entry exception at once reveals that there is no anomaly in the testimonial use of that portion of a business entry which constitutes so-called "included" hearsay. Thus, typically, the salesman or truckman who sells or delivers merchandise reports the facts to the bookkeeper, who records an entry thereof. When the entry is satisfactorily identified, its admission is probative of the sale price or delivery notwithstanding the "included" hearsay of those facts in the entry. This is routine administration of the business entry exception, the implicit basis thereof being the assurance of trustworthiness arising from the fact that the salesman and trucker are under a business duty honestly to report the facts to the bookkeeper, who is under a business duty honestly to record them. 5 Wigmore, op. cit., § 1530, p. 379.
Applying the foregoing rationale to the present case, there can be no difficulty over the double hearsay nature of the entry as probative of the truth of Fagan's declaration if we accept the premise that it was the general, known practice for injured firemen to report any injury or illness. It is not argued here that there was no such practice or that Fagan's complaint is not fairly referable thereto. We find it clearly inferable that it was. The requirements of the rule are therefore satisfied.
Respondent relies upon Kelly v. Ford Motor Co., 280 Mich. 378, 273 N.W. 737 (Sup. Ct. 1937), and Schmitt v. Doehler Die Casting Co., 143 Ohio St. 421, 55 N.E.2d 644 (Sup. Ct. *318 1944). In the Kelly case, a compensation matter, the decedent employee went to the defendant's first-aid department a few days after the alleged injury, where he was treated and a memorandum made as to his version of the accident. The memorandum was received in evidence and an award granted. This was reversed for error in the admission of the evidence. The court held that the Michigan statute (like the Model Act) could not justify the admission since it would be unfair for an employer, bound by law to make a record of such accidents, to make a "hearsay" unverified record and then be confronted with it as proof of an accident. The court said: "The act does not make that proof which is not proof; nor does it purport to change the rules of competency or relevancy with respect to recorded facts. It merely provides a method of proof of an admissible `act, transaction * * *.'" (273 N.W., at p. 741) (emphasis ours). It is apparent that this reasoning begs the question as to the statutory intent. The act revises the common-law exception. Whether or not an entry as to an act or transaction is "admissible" thereunder is a matter of construction of the statute in relation to the facts. It has always, as noted, been the rule that hearsay otherwise inadmissible becomes admissible if one under a business duty to report a fact known to him to another, does so, and an entry to that effect is made in the course of business by the other. It would be another thing to say, in relation to the facts in Kelly, that the entry was inadmissible because not sufficiently close in time to the occurrence; or because the informant was not under any business duty promptly to report the injury; or, perhaps (but doubtfully), because the trial judge should have found the circumstances too lacking in assurance of truthworthiness to warrant admission (the Model Act expressly makes lack of personal knowledge of the entrant, etc., a factor going to admissibility, not weight). See further discussion of this, infra. The decision is not persuasive against the present petitioner's position for admissibility.
*319 The Schmitt case, supra, was obviously correctly decided on its facts, under the Uniform Act, because the complaint of injury was made by the employee to the employer's nurse and recorded by her five days after the occurrence (and thus not "at or near the time of the act, condition or event").
In any event, it is now settled, by the better view, that "the report of an employee, such as a bus or truck driver, or a locomotive engineer of an accident in the course of business, when such report is required by the employer's instructions and routine should qualify as a business record, and should be evidence of the facts recited, at least so far as it is based on the reporter's first-hand knowledge." McCormick, op. cit., § 277, p. 604.
Where, however, the informant to the entrant of the record is under no duty to anyone to make a truthful account of the facts thus recorded, the record will not be admissible as proof of such facts. Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517 (Ct. App. 1930) (report of policeman as to accident based on information from bystander witnesses; decided under Model Act; leading case). Aside from Wigmore[6], no competent authority in the field and few courts have dissented from this qualification obviously basic to the rationale of the business entry exception. See McCormick, op. cit., § 286, pp. 602, 603; McCormick, "Hearsay," 10 Rutgers L. Rev. 620, 629, 630 (1956); Maguire, Evidence, Common Sense and Common Law, op. cit., at p. 159; "Revised Business Entry Statutes: Theory and Practice," op. cit. (48 Colum. L. Rev., at p. 927). Illustrative cases are United States v. Grayson, 166 F.2d 863 (2 Cir. 1948; per Learned Hand, J.); Central Railroad Co. of New Jersey v. Jules S. Sottnek Co., 258 F.2d 85 (2 Cir. 1958); United *320 States v. United Shoe Machinery Corp., 89 F. Supp. 349 (D. Ct. Mass. 1950). But see Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467 (3 Cir. 1950).
For the sake of completeness of the discussion, it should be noted that where a business record can qualify, under the rules stated, only as evidence of the fact that the report or declaration was made to the entrant, but not as evidence of the truth of the contents, insofar as the business entry exception is concerned, such contents may nevertheless be evidential if warranted by any other exception to the hearsay rule.[7]
Thus we conclude that there is no merit in the argument for exclusion of the journal entry as "included" hearsay.
Finally, on the admissibility phase of the case, we address ourselves to the question whether the entry should be excluded because so untrustworthy, in relation to Fagan's potential motive to misrepresent, that we should make a determination for exclusion under the statutory criterion that "the sources of information,[8] method and time of preparation" of the entry do not "justify its admission." In our view, the quoted statutory language should be taken to mean *321 only, in the present context, and insofar as "sources of information" are concerned, that the source be an informant having a duty to make an honest report to the entrant (or through intermediary persons or devices to the ultimate entrant), subject also, perhaps, to the discretionary right of the judge to exclude upon a very strong showing of patent untrustworthiness of the source. Considerations of reasonable predictability in relation to admissibility of evidence are not well-served if the proponent is generally to be at the mercy of the trial judge's subjective reaction as to the motivation to misrepresent on the part of a declarant who is ordinarily not present and who ex hypothesi was under a duty to report truthfully. The probative weight of the recorded statement in the light of all surrounding circumstances should ordinarily be left to the trier of the facts.[9]
This was the approach of Professors Maguire and Morgan, criticizing the majority opinion of Judge Frank in the Second *322 Circuit in the Palmer case (sub. nom. Hoffman v. Palmer, 129 F.2d 976 (1942)), the affirmance of which on other grounds by the Supreme Court has already been discussed. Judge Frank, construing the federal (Model Act) statute, sustained the exclusion of the engineer's report on the purported grounds (a) that the "primary purpose of the employer" in ordering accident reports of the character there involved to be made was "to use them in litigation involving those accidents" (at p. 993), and (b) the maker of the report knew at the time of making the report that "he [was] very likely * * * to be charged with wrongdoing as a participant in that accident" (at p. 991). The statement was described as "dripping with motivations to misrepresent." (Ibid.) Professor Maguire, in a comment on the case, found this rationale erroneous on the basis of an analysis of the background of the Model Act establishing that the committee which drew it "unquestionably" intended that the "interest of the declarant affects the weight, not the competency of the evidence." 56 Harv. L. Rev. 458, 467, 468 (1942). See the renewal of the assault in Maguire, Evidence: Common Sense and Common Law, op. cit., at p. 157.
Professor Morgan described the Frank approach to the statute as "extremely unfortunate. It assumes the inherent validity of the restrictive rule of the common law instead of regarding the entire hearsay rule as an exception to the principle that a trier of fact should have the advantage of considering all available relevant data. It adopts the technique that has hampered almost all attempts to reform rules of procedure and evidence." "The Law of Evidence," 1941-1945, op. cit., at pp. 565, 566. Judge Clark, strongly dissenting in Hoffman v. Palmer, regarded the majority opinion as originating a "process of restrictive interpretation of the statute which we have hitherto unanimously repudiated." (129 F.2d, at p. 999). He pointed to the fact that the same court had already decided, in United States v. Mortimer, 118 F.2d 266 (2 Cir. 1941), that accounting charts prepared in the course of an accountant's business were not rendered inadmissible *323 because intended for use as evidence in a criminal prosecution; but cf. Hartzog v. United States, 217 F.2d 706 (4 Cir. 1954).
The movement in the federal courts away from the Hoffman v. Palmer principle of exclusion because of motive of entrant or declarant to misrepresent is pronounced. Pekelis v. Transcontinental & Western Air, Inc.; Korte v. New York, N.H. & H.R. Co.; Landon v. United States; White v. Zutell; Terrasi v. South Atlantic Lines, Inc.; Puggioni v. Luckenbach Steamship Company; United States v. New York Foreign Trade Zone Operators, all supra. Wigmore's view, but not stated with specific reference to the effect of either the Uniform Act or the Model Act, is that although the offeror need not show an absence of all motive to misrepresent, "the existence of a fairly positive counter-motive to misrepresent" in a particular instance would fairly call for exclusion, provided such a rule is not "interpreted with overstrictness." See Nelson v. Lee, 249 Ala. 549, 32 So.2d 22 (Sup. Ct. 1947) (exclusion; facts indicating risk of criminal prosecution of informant).
As the judge of compensation was not here called upon to make a trial ruling as to admissibility of the entry, we will do so in the exercise of our permissive original jurisdiction. Conceding, for argument, the discretionary excludability of an entry where there is patently very strong motive to misrepresent, we do not find such a state of affairs here. The language of Fagan's report, in the light of the attendant circumstances, obviously suggests no realization by him that his "hurting" his arm and shoulder was the precursor of a heart attack, much less a legally compensable one. If it permits an inference of consciousness of a possible disability claim for an injured arm or shoulder, the possible motivation of self-interest is in our judgment sufficiently neutralized, for purposes of admissibility, by presumptive sanctions for making a false accident claim. We therefore rule for admissibility, leaving attendant circumstances to be appraised for weight.

*324 III.
We arrive at the factual issue where petitioner failed in the County Court  whether Fagan actually made the report which Bishof wrote in the journal. As is our duty, Russo v. United States Trucking Corp., 26 N.J. 430 (1958), we have reevaluated the facts on the same record the County Court had before it and are constrained to disagree with its finding that the report was not in fact made. Most significantly, as already noted, the County Court failed to notice the evidence of the contemporaneous making of the journal entry. We decline to believe Bishof would deliberately manufacture a false entry in the log the same night as the purported report to him by Fagan. Conceding a basis for some suspicion of solicitude on the part of the various firemen witnesses for the cause of Fagan's widow, we still cannot conclude that Fagan did not make the complaint in question to Bishof, particularly as against the contrary express finding of the compensation judge who heard the testimony.

IV.
There remains the determinative question whether Fagan's work contributed in any material way to his death from the heart attack. Are the criteria for recovery, recently comprehensively restated in Dwyer v. Ford Motor Co., 36 N.J. 487 (1962), satisfied here? The language of the court is peculiarly apposite in this case:
"The reasoning process by which the facts in a particular case are evaluated may be further aided by certain inquiries. Did the disabling or fatal attack result alone from the inexorable march of the disease? Was it the end result of the degenerative process in connection with which the employment stress was simply a coincidental condition, unrelated in any material way? Has it been shown by evidence, opinion or otherwise, that the exertion attendant upon the duties of employment, no matter how slight or how strenuous, and no matter with what other factors, such as pre-existing disease or predisposition to attack, it may be combined, was sufficient to contribute toward the attack or its aggravation? In short, where the heart has deteriorated *325 to the point that potentially any appreciable degree of exertion carries a danger of precipitating, or so acting upon the condition as to accelerate, a disabling or fatal attack, if the effort or strain, which in fact precipitates or contributes to the attack, occurs during the course of the employment and as an ordinary or usual incident of the work, the resulting disability or death is compensable." (at p. 492; emphasis original)
We are persuaded that the probabilities are that the report Fagan gave Bishof was a substantially truthful account of Fagan's impressions of his experience with the extinguisher and the illness and dizziness immediately consequent thereon. The corroborative heart symptoms on June 30, 1959, followed by death on July 1, 1959, render it more likely true than false that Fagan had the symptoms of heart failure (identified by Dr. Lieb), particularly difficulty in breathing, recounted by Bishof as having been observed by him in varying degrees from the time of Fagan's return at 6:30 P.M. on June 29 and through the night. From the premise of the substantial truth of this testimony, it is reasonable to assume that a man as sick as Fagan was at 6:30 P.M. would not lie about what happened (or he thought happened) about 15 minutes previously. We are, moreover, persuaded, as was the experienced judge of compensation, as to the correctness of the interpretation by Dr. Lieb of Fagan's report of what the latter considered merely an injury to the arm and shoulder as being medically in fact "the onset of an acute coronary insufficiency," as indicated by the concomitant and directly sequential physical symptoms. These considerations may well explain why Fagan said nothing about the "injury" or "accident" to Captain Leblein, Fagan's wife and son, or Dr. Barnert. He was primarily concerned about his illness, not by what he probably then considered a comparatively minor sprain to his arm and shoulder unrelated to his illness, which, by the next day, he must have realized was a heart attack like the one he had had the preceding August, but nevertheless still probably unrelated in his mind to the arm and shoulder injury.
*326 Dr. Lieb's testimony, set forth above, satisfactorily furnishes the "explanation of the physiological reactions of the diseased or ailing heart to the work strain in terms of sole or contributory cause and effect" found indispensable in Dwyer (36 N.J., at p. 495). Dr. Lieb did not, in explaining his conclusion, place any emphasis on the testimony concerning the unusual nature of Fagan's lifting or carrying fire extinguishers. Nor do we rest our satisfaction with the expert opinion of the doctor upon a finding that the work effort was unusual. Such a finding is not essential to petitioner's case. Dwyer, supra. The strain in lifting, such as it was, sufficed in the doctor's opinion to set in train physiological reactions ultimately resulting in death.
We find Dr. York's rebutting testimony weak and unconvincing in relation to a hypothesis inclusive of the lifting episode and the immediately sequential symptoms of illness, particularly when taken in contrast to the freedom from any symptoms before the decedent set out to deliver the extinguisher.
From the proofs as a whole, we entertain the requisite feeling of probability that the lifting or carrying of the fire extinguisher played a material part in causing, contributing to or accelerating a heart incident directly leading to decedent's death. Ciuba v. Irvington Varnish and Insulator Co., 27 N.J. 127 (1958); Dwyer v. Ford Motor Co., supra. The probative burden has been sustained.
The judgment of the Essex County Court is reversed and the award of the Division of Workmen's Compensation reinstated.
NOTES
[1] The same result would be achieved if proposed Rule 63(4)(c) of the Uniform Rules of Evidence (approved 1953) of the National Conference of Commissioners on Uniform State Laws were adopted. This creates as an exception to the hearsay evidence rule, "if the declarant is unavailable as a witness, a statement narrating, describing or explaining an event or condition which the judge finds was made by the declarant at a time when the matter had been recently perceived by him and while his recollection was clear, and was made in good faith prior to the commencement of the action."

In Massachusetts, by statute, a declaration by a deceased person is not inadmissible as hearsay in a civil proceeding if found to have been made in good faith and upon personal knowledge of the declarant. Mass. Gen. Laws Ann., c. 233, § 65 (1956).
[2] We are not here concerned with the forerunner and now largely obsolete "shop-book" rule developed to enable tradesmen to prove obligations by their debtors at a time when the shopkeeper was disqualified to testify in support of his own claim.
[3] Distinguish the question, discussed later herein, whether the admission of an entry based entirely upon information provided by a person other than the entrant requires that person to have been acting in the course of a business or pursuant to a duty of some kind, rather than purely as a volunteer, as in Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517 (Ct. App. 1930), for example.
[4] 28 U.S.C.A. § 1732 (adopted 1936). The Model Act reads as follows:

"Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event shall be admissible in evidence in proof of said act, transaction, occurrence or event, if the trial judge shall find that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term business shall include business, profession, occupation and calling of every kind."
This is not to be confused with the Model Code of Evidence, section 514 of which deals with business entries, approved by the American Law Institute in 1942, which, although not enacted in any state, was an important step in the evolution of the modern movement for improvement of the law of evidence.
See also proposed Rule 63(13) of the Uniform Rules of Evidence (approved 1953), mentioned above, which reads: "Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the judge finds that they were made in the regular course of a business at or about the time of the act, condition or event recorded, and that the sources of information from which made and the methed and circumstances of their preparation were such as to indicate their trustworthiness; * * *."
[5] We are not here concerned with the problem of reports including opinions or diagnoses by experts. New York Life Ins. Co. v. Taylor, 79 U.S. App. D.C. 66, 147 F.2d 297 (D.C. Cir., 1945).
[6] 5 Wigmore, op. cit., § 1530a, pp. 391, 392. Notwithstanding Wigmore, it would be astounding to most lawyers to be told that under the Uniform Act voluntary statements made to an investigating policeman after an accident by bystanders not produced in court become admissible because the policeman includes such statements in his report.
[7] Such as admissions, or statements of history in hospital records admissible as germane to diagnosis or treatment. See, e.g., Kasiski v. International Paper Co., 31 N.J. 267 (1959), reversing and adopting the dissenting opinion in 58 N.J. Super. 353 (App. Div. 1959); Greenfarb v. Arre, 62 N.J. Super. 420 (App. Div. 1960); Barrie v. Central R.R. Co. of N.J., 71 N.J. Super. 587 (App. Div. 1962), certif. denied, 37 N.J. 87 (1962); See McCormick, "Hearsay," op. cit., (10 Rutgers L. Rev., at pp. 629-630) commenting upon Rule 66, "Multiple Hearsay," of the proposed Uniform Rules of Evidence of the National Conference of Commissioners on Uniform State Laws (approved 1953).

The fact of the entry rather than the truth of the contents may be evidential where the entry is used to establish notice, rather than the truth of the facts recorded. Schwartau v. Miesmer, 50 N.J. Super. 399, 413 (App. Div. 1958), certification denied, Schwartau v. Borough of Closter, 28 N.J. 34 (1958); Goldberg v. Housing Authority of Newark, 38 N.J. 578, 579, 595 (1962) (dissenting opinion).
[8] We need not here be concerned with the judge's function in passing upon the trustworthiness and statutory requisites in relation to time and method of preparation of the record.
[9] Compare the views of the Supreme Court in Mahoney v. Minsky, supra, 39 N.J., at p. 218, in relation to the somewhat different problem of an offer by a debtor to prove payment by an entry in his own books:

"The last clause of the statute that the books should be accepted `if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify admission,' confers considerable discretion upon the trial judge. * * * Once that discretion has been exercised the holding will not be disturbed if supported by substantial even though conflicting evidence or inferences therefrom. * * * The guiding standards for the exercise of the discretion are set out in the clause quoted above. Once the proffered books are properly identified, are shown to have been kept in the regular course of business, at or near the time of the event in issue, and it reasonably appears that the sources of information, method and time of preparation were regular and routine, they ought to be admitted. Fisher v. Gunn, 270 S.W.2d 869, 878 (Mo. Sup. Ct. 1954). Ultimate decision as to their trustworthiness or credibility ought to be left to the jury. * * * Moreover, if the criteria for admissibility have been met, it should make no difference whether the entries in issue relate to loans or their payment. * * * Nor should competency turn on whether, in the context of the case, they are self-serving or admissions against interest. Such matters affect probative value or credibility and are for the fact finders."