THOMAS MAHONEY, PLAINTIFF-RESPONDENT, v. MORRIS MINSKY, ROBERT W. CAVERLY, AND MORRIS MINSKY AND ROBERT W. CAVERLY, PARTNERS, TRADING AS BELLEVUE SURGICAL SUPPLY CO., DEFENDANTS-APPELLANTS.

Argued December 17, 1962—Decided February 4, 1963.

Mr. *James A. Major* argued the cause for defendants-appellants (*Mr. James A. Major, II,* on the brief; *Messrs. Major & Major,* attorneys).

Mr. *Martin J. Brady* argued the cause for plaintiff-respondent (*Mr. James M. Barry,* attorney).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff Dr. Thomas Mahoney sued defendants Morris Minsky and Robert W. Caverly, individually and as partners trading as Bellevue Surgical Supply Co. on the following note:

"$7,000 Oct. 1, 1954.
 Two months after date we promise to pay to the order of Dr. Mahoney seven thousand dollars.
 Bellevue Surgical Supply Co.
 Morris Minsky
 Robert W. Caverly."

The making of the note was admitted; the defense was payment. After trial a jury returned a verdict for plaintiff plus interest in an uncomputed amount. Although the question of allowance of interest had been submitted to the jury, the trial court exscinded that portion of the verdict, saying equity demanded a denial of interest. Defendants appealed from the adverse judgment; plaintiff cross-appealed from the disallowance of interest. The Appellate Division affirmed the recovery on the note. It held also that plaintiff was entitled to interest from the due date of the note, and remanded the cause to the trial court for entry of an appropriate judgment. We granted defendants' petition for certification. 38 *N. J.* 316 (1962).

The Appellate Division was correct in declaring that plaintiff's award should include interest. In the absence of express provision to the contrary, a liquidated obligation of the type involved here carries conventional interest from the due date, as a matter of course. It is compensation for the use of, or hire of, money. *Knight v. Barnwell,* 130 *A.* 736, 3 *N. J. Misc.* 1128 *(Sup. Ct.* 1925) ; 1 *Restatement, Contracts,* § 337, *p.* 542 (1932) ; *McCormick, Damages,* § 54, *p.* 213 (1935) ; and see, *Uniform Commercial Code, L.* 1961, *c.* 120, § 3–122(4) ; *N. J. S.* 12A:3–122(4).

The circumstances attending the giving of the $7,000 note and its alleged payment are in sharp dispute. Plaintiff said that at various times between 1944 and 1948 he had made loans to defendants in $500 amounts, taking an individual note on each occasion. By 1948 he held 10 such notes which (he asserted) were consolidated into one note for $5,000, payable in one year. In 1951 he accepted a substitutionary three-year note for $6,000, which included $1,000 for past due interest. On October 1, 1954, in lieu of payment, the obligation was replaced by a note for $7,000 payable in two months. The new instrument, the subject of this suit, represented an additional $1,000 agreed upon as interest.

Defendants denied the claim of a series of notes culminating in the $7,000 obligation. They acknowledged bor-

rowing $7,000 from plaintiff on October 1, 1954 but insisted they received it in cash on that day. In support of their position, they produced their bank statement for October 1954 which shows a deposit of $7,000 on October 1. It was marked for identification but was declared inadmissible by the trial court. We agree with defendants that the ruling was erroneous. The statement issued by the County Bank & Trust Company, Passaic, and captioned in defendants' trade name, Bellevue Surgical Supply Co., appears perfectly regular on its face and as having been issued in the regular course of business prior to the inception of any controversy between the parties. In a case where the issue of credibility was crucial, this *ante litem motam* instrument obviously furnished competent and relevant corroboratory evidence for defendants and should have been received.

Defendants further testified that the $7,000 received from plaintiff on October 1, 1954, after being deposited, was used to pay off an outstanding note of theirs in that amount held by the same bank. In support of the testimony, a check dated October 1, 1954 for $6,994.17 to the County Bank & Trust Company, drawn on the Bellevue Surgical Supply Co. account there, was produced, as well as the $7,000 note stamped "Paid, October 1, 1954." Both documents were rejected as evidence. They should have been admitted for the very reason which supplied competent probative force to the bank statement. On their face they were natural and routine incidents of the $7,000 transaction with plaintiff as described by defendants. Their virtue as evidence lies in the fact that they, too, antedated this litigation by about five and one-half years and represented conduct occurring when the parties were close friends and their relations were harmonious. The weight to be given to all three of the described documents was for the jury to determine.

Plaintiff testified that in July 1959 he spoke to defendant Minsky about paying the note, and was told that the partners would get together and make an adjustment. Thereafter he became ill and was hospitalized, as a result of which nothing

was done until early in 1960. When he again communicated with Minsky and pressed for payment, he was told that the note had been paid. Suit was then instituted.

In his testimony Minsky insisted that in January 1955 he made a part payment to Dr. Mahoney of $2,500 in cash but received no receipt therefor. The balance of $4,500, he said, was satisfied in July 1955 by setting it off against a balance Dr. Mahoney owed defendants' firm for supplies and equipment furnished for his office. This aspect of the case presented the sharpest issue of veracity at the trial. It appeared that Minsky's deposition had been taken previously. At that time he swore that two payments, one $2,500 in January 1955 and the other $4,500 on April 25, 1955, were made in cash, the money to do so having been withdrawn from defendants' bank account. He testified the $4,500 was brought to the doctor's home, given to him in the upstairs living room, and that Mahoney counted it in his presence. Mahoney then told him that the note was lost but he gave him a written receipt showing payment in full. The receipt was not produced. Minsky said it was lost and probably destroyed in a serious fire which occurred on the Surgical Supply Co. premises in March 1960.

Minsky's explanation at the trial of the flagrant conflict in his testimony was that his earlier statement was mistaken. Subsequent to the deposition he had discussed the matter with his accountant and, after going over the company books, he discovered the fact to be that the $4,500 balance on the note had been satisfied by the cancellation of plaintiff's indebtedness for merchandise.

It was undisputed that Dr. Mahoney had been a customer of defendants for many years and had bought equipment and supplies from them. There was agreement also that there were loans from him to defendants represented by notes other than the note in suit. And Minsky admitted that the doctor always paid his bills for supplies by check, independently of any outstanding loans, and would never accept a credit on his professional account as a payment of, or offset on, an

existing note. The transactions were always kept separate and apart except in this one instance involving the $4,500 payment, alleged by Minsky and denied by the doctor.

The record shows, again without dispute, that in July 1954 Dr. Mahoney engaged in a substantial refitting and re-equipping of his office. Defendants did the work and furnished the equipment, the cost of which was $9,296.09. The full sum, less a down payment of $1,000, was borrowed by the doctor from the County Bank & Trust Company on a conditional sales contract, calling for 24 monthly payments of $380.24 each. The conditional sales agreement, and the payment coupon book, both showing payment in full to the bank as of August 15, 1956, were put in evidence. Minsky insisted, however, that at the same time additional rooms in the doctor's office were provided with equipment to the value of $4,500, which was not included in the conditional sales contract. These extras were carried on Mahoney's account with defendants, although no testimony was given as to the manner in which he was to pay the indebtedness. And as will be more fully noted hereafter, no invoices, bills or original account books showing or detailing the obligation were produced. The suggestion is that such records were lost in the fire. Plaintiff denied the existence of any such $4,500 debt or that he ever agreed to have it offset against a balance of that sum remaining unpaid on the $7,000 note.

Defendants offered certain alleged documentary proof of the January 1955 $2,500 cash payment and the April 1955 $4,500 credit against the note. Minsky testified that when he made the $2,500 payment it was in cash because the doctor wanted it that way. In order to comply with the request, he drew a check in that amount to cash on January 13, 1955, cashed it at the County Bank & Trust Company and delivered the currency to the plaintiff. The check was produced and offered in evidence but plaintiff's objection was sustained. It was error to do so. The reasons set out above as qualifying the other documents for admissibility apply as well in this situation. The $2,500 check, issued, as it was,

216

when the relations between the parties were friendly and normal and prior to any controversy over the $7,000 note, possesses some evidentiary value as corroboration of Minsky's testimony. It should not have been refused admission because considered in isolation it would seem to be self-serving. Its self-serving nature may well detract from its persuasive force in the minds of the jurors but in association with the factual and chronological framework of the case, it cannot be classified as incompetent.

As further evidence of the $2,500 payment and $4,500 credit, defendants offered their books of account which were said to have been kept in the ordinary course of their business. Plaintiff objected on the ground that under the New Jersey cases payment of a loan cannot be proved by the debtor's books even if kept in the regular course of business. Reliance was placed on *Oberg v. Breen,* 50 *N. J. L.* 145 (*E. & A.* 1887), and *Johnson v. Hoffman,* 7 *N. J.* 123 (1951). The trial court accepted the principle set down in those cases and sustained the objection.

It is true that in *Oberg* the court held "[a] man's book is not testimony in his own favor touching the receipts of money by him."; and that "a credit given by a trader to his customer [is not] evidence in his own favor." 50 *N. J. L.,* at *p.* 146. Defendants assert, however, that the rule was abrogated in 1949 by the adoption in this State of the Uniform Business Records as Evidence Act. *L.* 1949, *c.* 124; *N. J. S.* 2A:82–35. The act provides:

"A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

Plaintiff counters with the citation of *Johnson v. Hoffman, supra,* decided by this court in May 1951, which was two years after enactment of the Business Records as Evidence

Act. Examination of *Johnson,* a 4–3 decision, reveals that the suit was instituted on February 16, 1949, three months before- the act became effective, and that the new law was neither cited nor discussed nor its applicability to the situation at hand considered at the trial or on appeal. The problem of competency of a person's books of account to show payment was treated rather summarily in one paragraph, inadmissibility being predicated upon *Oberg v. Breen.* The trial court in the present case was understandably perplexed by the time sequence of the statute and *Johnson,* and because of it felt obliged to follow *Johnson.* We hold the view in the light of the statute, that the doctrine of *Oberg* can no longer be considered the law of this State, and to the extent that *Johnson v. Hoffman* follows *Oberg,* it must be disapproved.

It took a long time for the courts to recognize that business conditions and methods demanded relaxation of the strict rules of evidence which banned a merchant's books from lawsuits as self-serving hearsay. Adoption of the shopbook rule stemmed from a realization that mercantile and industrial life is essentially practical, that what is the final basis of calculation, reliance, investment, and general confidence in every business enterprise may ordinarily be resorted to in proof of the main fact, and that what the common experience of man relies upon ought not to be summarily discredited. See 10 *R. C. L., Evidence,* § 3, *p.* 861; "Revised Business Entry Statutes," 48 *Colum. L. Rev.* 920 (1948). As Wigmore put it:

"When it is a mere question of whether provisional confidence can be placed in a certain class of statements, there cannot profitably and sensibly be one rule for the business world and another for the court room. The merchant and the manufacturer must not be turned away remediless because methods in which the entire community places a just confidence are a little difficult to reconcile with technical judicial scruples on the part of the same persons who as attorneys have already employed and relied upon the same methods. In short, Courts must here cease to be pedantic and endeavor to be practical." 5 *Wigmore, Evidence* (3d ed. 1940), § 1530, *p.* 379.

The relatively limited and varied application of the shop-book rule led to a desire for greater liberality and uniformity in the acceptance of business records as evidence. One measure that evolved was the Uniform Business Records as Evidence Act which New Jersey and a number of other states have promulgated. *Wigmore, supra,* § 1530a; *Colum. L. Rev., supra;* "The Law of Evidence," 59 *Harv. L. Rev.* 481, 561–63 (1946).

 The basic theory of the uniform law is that records which are properly shown to have been kept as required normally possess a circumstantial probability of trustworthiness, and therefore ought to be received in evidence unless the trial court, after examining them and hearing the manner of their preparation explained, entertains serious doubt as to whether they are dependable or worthy of confidence. The last clause of the statute that the books should be accepted "if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission," confers considerable discretion upon the trial judge. *Webber v. McCormick,* 63 *N. J. Super.* 409 (*App. Div.* 1960); *Hancock v. Crouch,* 267 *S. W. 2d* 36, 43 (*Mo. Ct. App.* 1954); *Choate v. Robertson,* 31 *Wash. 2d* 118, 195 *P. 2d* 630 (*Sup. Ct.* 1948); *Douglas Creditors Assn. v. Padelford,* 181 *Or.* 345, 182 *P. 2d* 390, 394 (*Sup. Ct.* 1947); Comment, 35 *Cal. L. Rev.* 434, 441–2 (1947). Once that discretion has been exercised the holding will not be disturbed if supported by substantial even though conflicting evidence or inferences therefrom. *Richmond v. Frederick,* 116 *Cal. App. 2d* 541, 253 *P. 2d* 977 (*D. Ct. App.* 1953). The guiding standards for the exercise of the discretion are set out in the clause quoted above. Once the proffered books are properly identified, are shown to have been kept in the regular course of business, at or near the time of the event in issue, and it reasonably appears that the sources of information, method and time of preparation were regular and routine, they ought to be admitted. *Fisher v. Gunn,* 270 *S. W. 2d* 869, 878 (*Mo. Sup. Ct.* 1954). Ultimate decision as to their trustworthi-

ness or credibility ought to be left to the jury. In administering the act, courts must be mindful that it is designed for the books of workmen of the most limited education as well as for those of the most expert accountant. Academic formality and perfection are not the test of admissibility. If a book, regardless of its construction or form or material used, is capable of perpetuating a record of events and the notes or entries are fairly and honestly made in the regular course of business at or about the time of the transactions to which they refer, it ought to be treated as competent evidence. Annotation, 17 *A. L. R.* 2d 235, 243, 245 (1951). Moreover, if the criteria for admissibility have been met, it should make no difference whether the entries in issue relate to loans or their payment. *Hancock v. Crouch, supra.* Nor should competency turn on whether, in the context of the case, they are self-serving or admissions against interest. Such matters affect probative value or credibility and are for the fact finders.

These observations bring us to the books in question. Defendants produced a certified public accountant who had been examining and auditing their business books for about 25 years. In addition, the witness personally kept their general ledger. He described the bookkeeping system as follows:

"They are ordinary double entry system books consisting of purchase books in which all bills and invoices from creditors were entered. There also were sales records and then books of receipts and disbursements showing all moneys received from accounts and all moneys disbursed from the accounts. * * *

Besides the books of original entry there was a general ledger in which the summaries of all transactions for each month were entered and from which I prepared their tax returns."

He instructed the defendants' employees how to operate the books and as to the records they were to keep. He would visit defendants' place of business four times yearly and personally post the monthly summaries from the books of original entry to the general ledger.

Three books were produced and identified at the trial. Two of them were cash receipts and disbursement books, one

covering the period from November 1952 through part of October 1954, the second covered the remainder of October 1954 through September 1956. The third book was the general ledger described by the accountant as containing the monthly summaries of the business operation. It was asserted that these books show the plaintiff's loan of $7,000 and the installment payments of $2,500 and $4,500 in satisfaction thereof. Various pages purporting to reveal these facts have been pointed out. Our examination, without the aid of detailed explanatory testimony, leaves us in doubt as to the completeness as well as the clarity and sufficiency of the records. For example, we are referred to page 294 of the cash receipts book as showing receipt of plaintiff's loan. The top line of that page shows for October 1, 1954 receipt of $3.90 from a Dr. J. Bitsack and at the right-hand end of the same line in a column captioned "Passaic Nat'l" the figure $7,000. It bears no identification whatever to connect it with Dr. Mahoney. Nor do we find a specific identifying reference to his loan anywhere in the books.

In connection with the alleged setoff of $4,500 against Dr. Mahoney's indebtedness to defendants for furnishing some additional rooms in his office, we find no individual or general account in the books presented revealing his business dealings with defendants, either with respect to the loans or the work done and equipment furnished constituting the allegedly cancelled debt. Perhaps there are or were other books or records constituting an integral part of defendants' bookkeeping system or some further explanations of the books presented which will clarify the matter.

The trial court apparently did not examine the books produced. Since he took the view that under the *Oberg* and *Johnson* cases they were not admissible, undoubtedly he did not feel the need to do so. If those cases controlled, an exercise of his discretion as to whether they met the statutory criteria for receipt in evidence was not called for. But since books properly kept and identified are admissible to prove the making and payment of loans in the regular course of

business, justice requires that the case be remanded for retrial so that both parties and the court may explore fully the question whether *prima facie* the preliminary demands of the statute for admissibility can be met.

▮ We express no opinion as to the ultimate competency of the books. The matter is for the trial court after adequate presentation of evidence. (Of course, pretrial examination of the books and pertinent witnesses is open to plaintiff, if desired.) It is sufficient to note that:

" 'The law does not prescribe any standard of bookkeeping practice which all must follow, regardless of the nature of the business of which the record is kept. We think it makes no difference whether the account is kept in one book or several so long as they are permanent records, and constitute a system of bookkeeping as distinguished from mere private memoranda.' " *Robin v. Smith*, 132 *Cal. App.* 2d 288, 282 *P.* 2d 135, 137 (*D. Ct. App.* 1955).

The completeness and regularity of the record, the presence or absence of adequate and understandable entries, the honesty or suspiciousness in appearance, are aspects for preliminary appraisal before a declaration of competency is made. See *Wigmore, supra,* §§ 1531, 1551; 20 *Am. Jur., Evidence,* § 1065.

▮ As we have noted, the statute commits much to the discretion of the trial court with respect to the admissibility of books and records. Since an appellate tribunal will accept his judgment unless manifestly mistaken, the record should indicate clearly the reasons for his action. Accordingly, whenever proffered books are challenged, and proof is presented to bring them within the legislatively prescribed standards for admission in evidence, the trial judge should state specifically the factual basis for his decision to admit or reject them. In this connection, having in mind the purpose of the statute, it seems almost needless to point out that when books are rejected, an exacting requirement exists for precision in the statement of grounds for the action. Moreover, the trial judge ought to have in mind the possibility of prejudice to the case of the offeror of books, if they are denied ad-

mission in evidence following preliminary examination in the presence of the jury to determine their competency under the statute. Control of that possibility is in his hands and he has ample discretion to deal with it by excusing the jury, where necessary in his judgment, until he hears the proof and decides whether the books qualify for admission. If he admits them in evidence, the qualifying proof should be repeated to the jury, or read to them (by consent of the parties) unless the objection is withdrawn.

The judgment is reversed and a new trial ordered in accordance herewith.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.