STATE OF NEW JERSEY, PLAINTIFF, v. DONALD J. WELLER, DEFENDANT.

STATE OF NEW JERSEY, PLAINTIFF, v. TIMOTHY R. FLYNN, DEFENDANT.

Superior Court of New Jersey
Law Division Criminal
Warren County

Decided December 24, 1986.

*William M. McCurley* for plaintiff (*Richard C. Hare,* Acting Prosecutor of Warren County, attorney).

*Larry R. Etzweiler* for plaintiff (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

*Arthur J. Russo* for defendant Weller.
*John C. Cornish* for defendant Flynn.

KINGFIELD, J.S.C.

This opinion addresses the issue of whether a state police laboratory report, containing a positive reading of ethyl alcohol in the blood of a defendant, may be admitted into evidence under *Evid.R.* 63(13) and 63(15) without accompanying testimony from a qualified toxicologist or chemist.

Defendants, Timothy R. Flynn and Donald J. Weller, were involved in separate motor vehicle accidents which resulted in blood samples being taken. Subsequent state police laboratory reports disclosed blood-alcohol readings of .22% as to Weller and .224% as to Flynn. In each case the single page report was admitted into evidence in the municipal court and a subsequent conviction for driving while intoxicated followed. In neither case did a qualified chemist or toxicologist testify. The convictions in each case were affirmed by separate judges of the Superior Court, Law Division. In the Weller matter the Superior Court, Appellate Division, remanded the matter to the Superior Court, Law Division, for an evidentiary hearing to determine whether the blood-alcohol report was admissible. In the Flynn matter, the Superior Court, Appellate Division, reversed the conviction, 202 *N.J.Super.* 215. The Supreme Court, 103 *N.J.* 446, granted the petition for certification and summarily remanded the matter to the Superior Court, Law Division, for reconsideration in light of *State v. Matulewicz*, 101 *N.J.* 27 (1985). The two cases were consolidated for the purpose of taking additional testimony. This court has seen fit to reduce its previously rendered oral opinion to writing in view of the fact that no appeal was taken from the ultimate decision as to either defendant.[1]

---

[1]The laboratory report was admitted into evidence in the *Weller* case and he was convicted and chose not to appeal. In the *Flynn* case, the report was not admitted into evidence due to the inability of the State to produce complete

At the hearing the State produced the testimony of Dr. Richard Saferstein, Chief Forensic Chemist for the State of New Jersey. He related the general background and responsibilities of laboratory personnel, the standards and procedures used in performing blood-alcohol analysis, and the technical manner in which the test results were obtained and recorded. Defendants offered no independent testimony. The facts which follow are the factual findings of this court based upon the testimony of Dr. Saferstein.

The New Jersey State Police has four forensic laboratories throughout the State with each having a technical supervisor. The toxicology unit of the laboratory performs the blood-alcohol analysis. At the present time, toxicology units at the laboratories throughout the State analyze approximately 1,200 blood-alcohol samples in a period of approximately six months. The tests are performed by forensic chemists who hold Bachelor of Science degrees with a minimum of 24 hours in chemistry. The examiners are constantly supervised and test results are checked by the unit supervisor. All forensic chemists receive a salary for their services and there is no pay incentive based upon the number of results favorable to the State.

In every case, the blood specimen is assigned a number upon its receipt at the laboratory and is then placed in a refrigerator. The failure to properly refrigerate would cause a loss of alcohol resulting in a reading more favorable to defendant.

The blood-alcohol analysis is performed on an instrument known as a gas chromatograph. The test is commonly known as the head space gas chromatography test and has been used for a number of years, not only in this State, but also in numerous other jurisdictions. In general, the test is performed by separating the volatile, ethyl alcohol, from the liquid and

---

records of the standard tests performed on the gas chromatograph. The remaining evidence was insufficient to convict defendant and he was found not guilty.

injecting it into the gas chromatograph. The volatile passes through an electrical detector in the instrument at a given time and the quantity would be recorded on a graph. The particular peak on the graph is converted to a blood-alcohol reading.

More specific, the examiner is required to measure a certain quantity of defendant's blood, usually one milliliter. To this the examiner adds the same quantity of an internal standard, in most cases isopropanol alcohol in water. That substance is placed in a sealed container and heated in a water bath at approximately 37 degrees centigrade until equilibrium is obtained and the volatile separates from the liquid into the head space provided. If for some reason equilibrium is not properly obtained or if the volatile is prematurely withdrawn, the amount of volatile would be reduced resulting in a reading more favorable to defendant. The volatile is removed from the head space with a syringe and injected into the gas chromatograph column. Once in the column, the volatile is carried by a carrier gas, ordinarily nitrogen, which takes it through an electrical detector at a given time. The electrical detector measures the molecules in the volatiles thereby giving a reading for both the ethyl alcohol and the internal standard. The respective readings are readily noticeable since the volatiles pass through the electrical detector at a known time.

The results of the test are depicted as peaks on a graph which are recorded when the detections are made by the gas chromatograph. The peaks shown on the graph include one for the time of injection, one for the ethyl alcohol reading and one for the internal standard reading. The peaks appear on the graph within a known tolerance and any deviation from that standard would immediately be an indication to the examiner that something went wrong with the test. Standard procedures require that the test be run twice and that the results of the test be within a specified standard of error. If they are not, an additional test is performed and the result which fails to conform to the specified standard of error is discarded. The lower of the two remaining results is reported.

The ethyl alcohol peak on the graph is converted into a blood-alcohol reading. This is customarily done by a computer but it also can be checked manually. The test results are also subject to being checked by the unit supervisor.

The accuracy of the gas chromatograph itself is further checked on the day the tests are to be performed by running an internal standard, measured in certain predetermined quantities, through the equipment on two separate occasions during the course of conducting the tests. Such tests will disclose any problem with respect to the speed of the carrier gas in the gas chromatograph. The results of the standard tests are recorded on graphs.

All of the standard graphs and the graphs of the test results are retained as a permanent record. That record can be interpreted by anyone familiar with the operation of the gas chromatograph. The test is therefore a classic example of an objective test. It is to be distinguished from a subjective test where the expert is called upon to make a visual inspection of various specimens and compare them. The test is so routine that it is hard to imagine how a particular examiner could have independent recall as to a specific test which may have been performed on a given day. As a final check on the test results, a computer, which converts the graph peaks to the test result, is programmed to look for mistakes which would appear in the form of inconsistencies in the test results.

■ The conditions under which the laboratory report may be admitted into evidence pursuant to *Evid.R.* 63(13), as a hearsay exception, are threefold. First, the report must be made in the regular course of business. Second, it must be prepared within a short time of the test performed. Third, the source of information from which it was made and the method and circumstances of its preparation must be such as to justify its admission. From the evidence, it is clear that the first two requirements have been satisfied. The third necessitates a further discussion of the factual findings by this court.

In *State v. Matulewicz, supra,* our Supreme Court set forth significant factors to be evaluated in determining whether such test results should be accepted as reliable.

The factual record below is devoid of evidence that would elucidate the 'method and circumstances' involved in the preparation of the forensic chemist's laboratory report. Consequently, proofs should be adduced to reflect the relative degrees of objectivity and subjectivity involved in the procedure; the regularity with which these analyses are done; the routine quality of each analysis; the presence of any motive to single out a specific analysis for the purpose of rendering an untrustworthy report, and the responsibility of each State Police chemist to make accurate and reliable analyses. [101 *N.J.* at 30]

The evidence in this case should be examined in light of those factors. First, the head space gas chromatography test is a classic objective test which requires virtually no subjective analysis by the examiner. Certain standard procedures are performed resulting in a graph which can be readily converted to a blood-alcohol reading. There is nothing to visually compare. Moreover, the graphs provide a permanent record of each blood test and of each standard test performed on the equipment. All of these graphs can be obtained through discovery and can be made available to an expert retained by defendant. It is more than likely that any challenge to the test results would be based upon an interpretation of the graph results.

Second, the evidence indicated that approximately 1,200 tests were performed in a six-month period. Such frequency leads this court to conclude that the analysis is performed with great regularity.

Third, the same routine is followed in each analysis. There is a specific procedure manual which the examiner is required to follow.

Fourth, defendants have not suggested any persuasive reason why the one performing the analysis would have a motive to single out a specific analysis for the purpose of rendering an untrustworthy report. The forensic chemists performing the tests are highly qualified professional civil servants who perform a large number of tests on a given day. There clearly is

no pay incentive to encourage anyone to interfere with individual test results. On the contrary, employees would appear to be motivated to insure that the quality of the tests are maintained on a high level.

Fifth, each forensic chemist is subject to having his work periodically checked by his unit supervisor. Hence, there is an incentive to make an accurate and reliable analysis. Moreover, the resultant graphs constitute a permanent record of the performance of each chemist.

In addition to the foregoing, the likelihood of detecting an unreliable test result from the graphs which are retained is quite high. Deficiencies in the test can be readily noted by inconsistencies disclosed in the results.

In view of the foregoing, this court concludes that the State has clearly demonstrated the reliability of the blood test results when they are obtained as a result of the procedure described herein. The test results are therefore admissible under *Evid.R.* 63(13).

A discussion of the application of *Evid.R.* 63(15) is also necessary. This rule permits the admission of factual observations that are disclosed in the report of a public officer if they were within the scope of the officer's duty to perform the act reported or to observe the act, condition or event reported. Clearly, the blood analysis was within the scope of such a duty. Further, in view of the highly objective nature of the test, this court finds that it falls within those observations and findings which are permitted by *Evid.R.* 63(15). Therefore, the test results are also admissible under *Evid.R.* 63(15).

This court further finds that the admission of the test results under the foregoing rules of evidence does not violate the right of defendants to confrontation. *Cf. Stott v. Greengos*, 95 *N.J.Super.* 96, 99–100 (App.Div.1967); *Mahoney v. Minsky*, 39 *N.J.* 208, 218–219 (1963).

Accordingly, the laboratory reports containing the positive readings of ethyl alcohol in the blood of defendants are admissi-

ble without accompanying testimony from the qualified forensic chemist who performed the tests.

As a precondition, the State shall make available to defendants, within ten days, all graphs depicting the results of the blood-alcohol analysis and graphs of the standard tests performed on the gas chromatograph which relate to the tests of each defendant's blood. The notes of forensic chemists on the specific tests and standard tests, if any such notes exist, shall also be provided.

This matter is rescheduled for a further hearing in 45 days. Defendants shall give the State reasonable notice, in advance of the hearing date, of an intention to call an expert to challenge the test results.

The State shall submit an appropriate order.